IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JAKITA M. M.[1]           )
                          )
          Plaintiff,      )
                          )
vs.                       )     Civil No. 23-cv-3534-RJD[2]
                          )
COMMISSIONER OF SOCIAL SECURITY,   )
                          )
          Defendant.      )
                          )

## MEMORANDUM and ORDER

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff protectively filed an application for Disability Insurance Benefits on January 22, 2018.  Tr. 299-300.  She was denied initially on May 1, 2018, and again upon reconsideration on August 13, 2018.  Tr. 184-94, 196-208.  Plaintiff then filed a Request for Hearing on September 13, 2018.  Tr. 224-25.  A hearing was held on February 13, 2020.  Tr. 51-73.  The ALJ issued an unfavorable decision on March 3, 2020.  Tr. 20-45.  Because she did not agree with the decision, Plaintiff filed a Request for Review of a Hearing Decision/Order with the Appeals

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns.  *See* FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c).  (Doc. 10).

Council on April 1, 2020.   Tr. 1258.   The Appeals Council denied that request on September 26, 2020.   Tr. 6-12, 1176-82.   Plaintiff then filed a civil action against the Commissioner of Social Security on November 15, 2020.   Tr. 1183-88.   While her civil action was pending, Plaintiff filed a new application for Disability Insurance Benefits on November 17, 2020.   Tr. 1386-89.   That application was denied initially on June 10, 2021, and again upon reconsideration on June 8, 2022. Tr. 1189-98, 1201-29.   Then, on June 9, 2022, Magistrate Judge Gilbert Sison of the United States District Court for the Southern District of Illinois remanded Plaintiff's initial case.   Tr. 1233. The Appeal Council issued a remand order in accordance with the District Court order and also ordered that Plaintiff's subsequent application be consolidated with the remanded claim.   Tr. 1255.   A new hearing was held on February 6, 2023, and the ALJ again issued an unfavorable decision on April 28, 2023.   Tr. 1097-1030, 1131-1149.   Plaintiff then filed a Request for Review of a Hearing Decision/Order with the Appeals Council on May 18, 2023, Tr. 1087-91, which was denied on September 5, 2023, rendering the ALJ's decision the agency's final decision for purposes of judicial review.   Tr. 1079-86.   This timely action followed.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

The ALJ found Plaintiff's fibromyalgia was a severe impairment yet found a medical opinion unpersuasive and rejected Plaintiff's subjective reports based in part on a misunderstanding as to the presentation of fibromyalgia.   He also failed to consider the context of Plaintiff's activities when evaluating her subjective reports.   Is the decision supported by substantial evidence of record?

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statute.[3]   Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work?   20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled.   A negative answer at any step, other than at step 3, precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4.   Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy.   *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

Importantly, the Court's scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

U.S.C. § 405(g).   Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).   The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

The ALJ followed the five-step analytical framework described above.   The ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on December 30, 2021.   Tr. 1103.   He found that, through the date last insured, Plaintiff had not engaged in any substantial gainful activity but that she did suffer from the severe impairments of fibromyalgia and depression.   Tr. 1103.   While the ALJ did not conclude that any of these conditions met or equaled a listed impairment,   he did find that they limited Plaintiff's abilities.   Tr. 1104-05.

Specifically, the ALJ found that Plaintiff retained the following RFC:

to perform light work as defined in 20 CFR 404.1567(b).   Specifically, she can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; can stand and/or walk, off and on, for 6 hours during an 8-hour workday with standard breaks; can sit for 6 hours during an 8-hour workday with standard breaks; can never climb

ropes; can occasionally climb ladders, scaffolds, ramps or stairs; can occasionally
balance, stoop, kneel, crouch or crawl; can avoid ordinary workplace hazards, but
should have no exposure to hazards such as unprotected heights, or dangerous,
unguarded machinery; can only tolerate occasional concentrated exposure to
atmospheric conditions (as defined in the SCO) such as dust, odors, gasses, fumes,
or poor ventilation; can understand, remember, carry out, and maintain pace for
complex work tasks, but due to limitations maintaining focus, attention and
concentration, will be off-task for up to 5% of the time spread across an average
workday; can perform work that does not require the worker to constantly meet
strict deadlines.

Tr. 1105.  The ALJ then found that Plaintiff could perform her past relevant work as an

Administrative Assistant, Coordinator, or Skills Training, and Public Relations Coordinator.   Tr.

1117.  In the alternative, the ALJ found that Plaintiff could have performed other work as an

electrical assembler, router, and price marker.   Tr. 1119.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this

Memorandum and Order.   The following summary of the record is directed to the points raised

by Plaintiff.

**1.    Agency Forms**

Plaintiff was born on October 14, 1975.  Tr. 1442.   In her Disability Reports, she reported

a disability onset of November 1, 2015.  Tr. 1442.   Plaintiff submitted two Function Reports.   In

her March 2018 Function Report, Plaintiff stated that she suffers from severe migraines daily and

that her entire body aches.  Tr. 341.   She further stated that she is "unable to remember basic

everyday things," she is "exhausted, tired and fatigue[d] constantly," and she suffers from

depression and anxiety.  Tr. 341.   She reported she cannot stand or sit for a long time, and she

can walk for 10 to 15 minutes but then needs to rest for about 20 to 30 minutes.  Tr. 346.   She

has difficulty remembering and following instructions and difficulty handling stressful situations, which can exacerbate her pain and symptoms.   Tr. 346.

Regarding her daily activities, she reported that she "tr[ies] to get a bath or shower then wake up [her] kids," then go back to bed.   Tr. 342.   She calls her family or doctor for help, she eats, and she watches TV or reads.   Tr. 342.   Then again, she goes back to sleep and waits for her kids to come home and "tr[ies] to help them with homework."   Tr. 342.   She watches TV, reads, eats dinner, takes her medication, and returns to sleep.   Tr. 342.   She takes care of her husband and children; she wakes them up, reminds them to gather their belongings, cleans up after them, schedules their appointments, and reviews her daughter's schoolwork.   Tr. 342.   She clarified that her husband and other family members help her shop, clean the house, take kids to school and appointments, and go to school events.   Tr. 342.

Regarding any prior activities that have been limited due to her diagnosis, Plaintiff reported that she cannot sleep regular night hours anymore, she cannot get up and cook or comb her hair, drive herself and family around, clean up the house, go out to events, visit with friends and remember important things.   Tr. 342.   Regarding her personal care, she described that she cannot tie her shoes, zip or button some clothes, bathing takes longer and gets her tired and out of energy, and she cannot shave her body.   Tr. 342.   Her husband and family members help her remember to take her medication, and she also uses a phone alarm.   Tr. 343.   She can still prepare easy meals, possibly on a weekly basis, but cannot cook complete meals because she struggles with standing for too long and often forgets steps or ingredients.   Tr. 343.   She does basic cleaning, ironing, folding towels, and watering plants bimonthly, for 5-10 minutes, but then needs to take breaks.   Tr. 343.   She needs assistance while she is doing those chores, in that she cannot set up

6

the ironing board and iron on her own, and fill the water container, while her kids bring the towels to her for folding.  Tr. 343.  She cannot do any yardwork.  Tr. 343-44.  She walks outside and rides in a car weekly, but she does not do so alone because she gets confused and disoriented.  Tr. 344.  She goes shopping for household items, clothes, and food bi-monthly, which can take up to an hour or longer, but she still needs to take breaks to rest.  Tr. 344.  She takes care of some of the family finances occasionally, but her husband does it primarily because in the past she has left bills unpaid, resulting in late fees and services being disconnected.  Tr. 344.

As for her hobbies and social activities, she reported that she reads and watches TV daily between her naps and that she may play board and card games with her kids "in bed" when she has "a little energy."  Tr. 345.  She occasionally communicates with friends through social media, talks on the phone with friends and family daily, and sees some in person weekly, but the frequency of those communications depends on how she feels and on whether she needs help.  Tr. 345.  She reported going to religious groups and doctor appointments on a regular basis, a few times a month, depending on how she feels.  Tr. 345.  She does not like being around people after her diagnosis and prefers to stay in bed.  Tr. 346.

In her May 2021 Function Report, Plaintiff again reported that she suffers from daily body pain, and she cannot always bathe or shower.  Tr. 1469.  She is depressed and "when it is intense [she cannot] get out of bed."  Tr. 1469.  She cannot get out of bed 2 to 3 days a week, while on other days, she can wake up and get out of bed to get her breakfast.  Tr. 1470.  She cannot sit or stand longer than about 40-45 minutes at a time.  Tr. 1469.  She takes care of her husband and kids in that she reminds them of their chores and wash days, schedules doctor appointments, sorts her husband's clothes, drives her son to work twice a week, and does some shopping.  Tr. 1470.

7

Her husband, uncle, and other friends help with picking up her son from work, assist her with cleaning up and other chores, and attend other appointments.   Tr. 1470.   Regarding the household chores, she waters her plants twice a month, she can put some things in the washer, fold a few items and towels, wipe off the table and sink, rinse-but not wash-dishes, iron, and Swiffer the floors.   Tr. 1471.   As in her prior report, she explained that she does need assistance with certain aspects of those chores, but she tries to do them because she "need[s] to move around." Tr. 1471. She reported again that she does not do any yard work.   Tr. 1471.   She drives or rides in a car two to three times per week, but she does not go out alone because, in the past, she had lost her balance and forgotten the purpose of being out.   Tr. 1472.   She goes shopping with her husband and kids once or twice a month.   Tr. 1472.   She has difficulty handling money due to confusion and memory issues.   Tr. 1472-73.

As to her hobbies and interests, she substantially repeated her statements from the March 2019 report but clarified that she only plays card and board games with her kids two to three times a month.   Tr. 1473.   As to her social activities, she explained that she does not go anywhere outside the home on a regular basis, and she attends some religious services via Zoom.   Tr. 1473. She also explained that she cannot call into a job daily because she experiences severe fluctuation in pain and mood even within the same day, and some days she is confined to bed.   Tr. 1476. She is concerned that the work-related stress will cause flare-ups of her symptoms, resulting in additional days being called off.   Tr. 1476.

### 2.    Evidentiary Hearing

Plaintiff testified telephonically at a hearing before Administrative Law Judge Robert E. Kelly.   Tr. 1131-49.   She testified that she suffers from "flares" of her fibromyalgia that debilitate

her for a day or two, but it can last up to five days.   Tr. 1137.   She experiences flares at least once every two weeks.   Tr. 1138.   During a flare, she is able to rest, sleep, go to the restroom, and then go back on the couch, but she cannot perform her personal hygiene or laundry.   *Id.*   Her children and husband do chores for her that she would have normally done.   Tr.1139.   On days when her fibromyalgia is not flared up, she is able to do laundry, wash dishes, mop floors, and dust, but she does so "slowly" and "not as thoroughly," and she needs to take breaks after about 15 to 20 minutes.   Tr. 1139-40.   She can stand for two hours without a flare but only 15 minutes with a flare.   Tr. 1140.   She can sit for two hours without a flare, but only 10 to 20 minutes with a flare.   Tr. 1140-41.   She can lift or carry a half gallon of milk without a flare, but only 24 ounces of water with a flare.   Tr. 1141.   She testified that her medications have stayed consistent.   Tr. 1141.   She requested an increase, but her doctor did not think it would be a good idea as it would cause her to be in a zombie-like state.   Tr. 1141.   She testified that she is depressed because, while in a flare, she cannot get basic things done.   Tr. 1138.

### 3.    Relevant Medical Records

On April 24, 2015, Plaintiff presented for an office visit at West County Medical Associates with symptoms of body aches.   Tr. 489.   Plaintiff reported that receiving a pedicure or manicure had become painful, that her body aches became worse during travel, and that hugging her children had become unpleasant.   Tr. 489.   Michele Marcus, N.P., noted that Plaintiff exhibited tenderness with pressure applied to the scapular area, elbow, and ankle.   Tr. 491.   In a follow-up consultation on May 29, 2015, Plaintiff reported extreme fatigue, snoring, unrefreshing sleep, and legs "jumping around" while asleep.   Tr. 483.   She stated that Cymbalta helped her muscle aches.   Tr. 483.   NP Marcus referred Plaintiff to a pulmonologist, Dr. Jeffrey Harris,

9

regarding her sleep problems.   Tr. 483.   Then, on June 29, 2015, Plaintiff reported her body aches

were worsening.   Tr. 479.   She recounted that during a week in which it had rained, "[she] could

hardly move [she] hurt so bad."   Tr. 479.   NP Marcus prescribed Meloxicam and referred

Plaintiff to a rheumatologist, Dr. Steven Lauter.   Tr. 479.   Plaintiff saw Dr. Harris on August 25,

2015, for an investigation into her sleep problems.   Tr. 536.   Dr. Harris found that Plaintiff had

"multiple sleep issues," including profound hypersomnia with an elevated Epworth at 19, a high

likelihood of sleep apnea, and restless legs.   Tr. 537.   As a result, Dr. Harris prescribed Mirapex

to address Plaintiff's restless legs and recommended a sleep study.   Tr. 537.

On August 27, 2015, Plaintiff had her initial visit with Dr. Lauter.   Tr. 519.   Based on

Plaintiff's symptoms, Dr. Lauter suspected fibromyalgia.   Tr. 519.   Dr. Lauter noted that

Plaintiff's symptoms were moderate to severe, occurred intermittently, and were worsening.   Tr.

at 519.   Plaintiff reported her pain was aching and dull and aggravated by climbing stairs, lifting,

and movement.   Tr. 519.   Plaintiff's musculoskeletal exam showed tenderness in the arms and

shoulders with mildly reduced range of motion, but normal cervical and lumbar spine, no swelling,

and intact reflexes.   Tr. 521.   Dr. Lauter suggested physical therapy, but Plaintiff wanted to wait.

Tr. 519.   Dr. Lauter ordered x-rays of the left shoulder and chest, as well as lab tests.   Tr. 519.

The shoulder x-rays and lab results were unremarkable, but the chest x-rays revealed an

enlargement of the main pulmonary artery.   Tr. 784-88, 790, 792.

On October 1, 2015, Plaintiff again reported joint pain, fatigue, and general pain.   Tr. 515.

Dr. Lauter stated that Plaintiff exhibited "multiple tender points as before," but otherwise normal

musculoskeletal findings.   Tr. 518.   At the time of the visit, Plaintiff reported her pain as 2/10,

and Dr. Lauter summarized that her fibromyalgia symptoms appeared to be improving.   Tr. 515.

10

On September 28, 2015, Plaintiff presented to Maria Walls, A.N.P., to review a CT scan report for enlarged pulmonary artery, at which time she reported that she was "feeling well overall" without, however, specifically referring to her fibromyalgia symptoms.   Tr. 474.   On October 27, 2015, Plaintiff presented again to NP Walls and reported that she initially had right-sided low-back pain but that her back pain had receded and been replaced by sharp hip pain.   Tr. 471.   Plaintiff rated the intensity of her pain at a level 8/10 and reported that walking and certain movements aggravated the condition.   Tr. 471.   As a result of her hip pain, Plaintiff remained in bed all day. Tr. 471.   NP Walls ordered a cortisone injection for her right hip and prescribed Methylprednisolone.   Tr. 471.

A sleep study performed on November 8, 2015, revealed mild sleep apnea, and CPAP treatment was recommended.   Tr. 554, 538.   On December 1, 2015, Plaintiff's primary care physician, Dr. James Corder, observed that even with physical therapy, Plaintiff's hip pain was not alleviated.   Tr. 468.   She also reported that recently she had been experiencing pain in her groin.   Tr. 468.   Dr. Corder ordered an x-ray of the right hip, which was normal.   Tr. 468, 497. Dr. Corder diagnosed Plaintiff with chronic fibromyalgia, noting she was "on meds" and her condition was "fairly well controlled."   Tr. 468.

On January 11, 2016, Plaintiff saw her gynecologist, Dr Ursula Thatch, who noted that Plaintiff had been prescribed Duloxetine and Xanax to cope with work-related stress.   Tr. 957. Dr. Thatch noted that Plaintiff was doing well while being off work, but also recorded Plaintiff's complaints of arthralgias and joint pain.   Tr. 957-59.   On January 11, 2016, Plaintiff presented to her pulmonologist with unresolved sleep problems.   Tr. 538.   She initially felt much more rested when she began using her CPAP, but she remained significantly somnolent during the daytime.

Tr. 538.

On March 14, 2016, Plaintiff presented to NP Walls with worsening fibromyalgia symptoms and reported "constant[]" flare-ups.   Tr. 464.   She also noted that she had issues with energy, memory, and concentration.   Tr. 464.   These issues resulted in her receiving disciplinary action at work, including a write-up.   Tr. 464.   As a result of these difficulties, Plaintiff consulted with her psychologist, who recommended taking time off work.   Tr. 464.   Plaintiff's psychologist later encouraged Plaintiff to return to work.   Tr. 464.   When she attempted to return to work, however, she suffered from panic attacks and could not tolerate it.   Tr. 464.   She was eventually advised by her employer to apply for long-term disability.   Tr. 464.   Plaintiff also stated that she had numbness in her hands and feet and that she did not drive when numbness was occurring.   Tr. 464.   NP Walls indicated that Plaintiff's four extremities appeared normal at visual overview.   Tr. 466.

During a visit with her gynecologist, Dr. Thatch, on July 27, 2016, Plaintiff stated that she was still not working but had been doing some volunteer work, and that she was "feeling good overall."   Tr. 962.   She reported occasional pain but also clarified that her muscle and joint aches were more severe in the summer.   Tr. 962.   On August 10, 2016, Plaintiff saw NP Walls, who noted that Plaintiff's fibromyalgia was "worse," with her symptoms being more severe in the summer and reflecting joint pain which was aching and constant.   Tr. 460-61.   On August 16, 2016, Plaintiff's pulmonologist, Dr. Harris, noted that Plaintiff used her CPAP consistently, but still suffered from hypersomnia.   Tr. 540.   Dr. Harris prescribed Nuvigil.   Tr. 541.

In October of 2016, Plaintiff began seeing a new rheumatologist, Dr. Kimberly Carroll. Tr. 511.   In an examination on October 7, 2016, Plaintiff related that while she felt her prescribed

12

Cymbalta was helping her muscle aches, her fibromyalgia flares were unpredictable and "like a roller coaster." Tr. 511. Plaintiff elaborated that she would have one good day, followed by several bad days with significant amounts of fatigue and achiness. Tr. 511. On exam, Dr. Carroll documented unidentified tender points but otherwise normal findings. Tr. 513. Dr. Carroll noted that Plaintiff "does not really exercise at all," and "had a long discussion . . . about the importance of exercise and sleep." Tr. 511. In a follow-up consultation with Dr. Carroll on February 10, 2017, Plaintiff stated that she was doing "about the same" and reiterated that she had some good days and some bad days. Tr. 508. The relevant record also states, however, that she was doing relatively well overall, with more good days than bad, and that she had been doing well with Cymbalta. Tr. 508. The exam showed no tender points and normal findings. Tr. 510. Less than two weeks later, in a visit with her gynecologist, Plaintiff reported muscle aches, arthralgias, and joint pain. Tr. 966. She also reported that she felt anxious, had a depressed mood, and was feeling out of control or overwhelmed, but was doing "much better" and was "still on disability." Tr. 966.

During a March 16, 2018, visit with NP Walls, Plaintiff reported that she suffered from chronic pain and exhaustion. Tr. 758. She reported spending many days in bed. Tr. 764. Plaintiff met with her rheumatologist on the same day regarding her fibromyalgia and reported ongoing pain and depression. Tr. 826. Dr. Carroll's physical examination of Plaintiff revealed positive results for the left Tinel sign and positive for fibromyalgia tender points. Tr. 826. Less than one week later, Plaintiff met with her pulmonologist on March 22, 2018, and reported that she suffered from fatigue, pain that disrupted her sleep, and restless legs that were not controlled. Tr. 581.

Dr. Vittal Chapa, M.D., a consultative examiner, evaluated Plaintiff on April 12, 2018. Tr. 591. Regarding Plaintiff's fibromyalgia, Dr. Chapa found that Plaintiff was tender all over, with no specific trigger points due to fibromyalgia. Tr. 593. Dr. Chapa stated that the "[p]hysical examination is unremarkable." Tr. 593. On April 20, 2018, Plaintiff's rheumatologist, Dr. Carroll, issued her opinion concerning Plaintiff's functional abilities. Tr. 601-03. She determined Plaintiff could occasionally lift 10 pounds, never lift 20 pounds, occasionally twist or stoop, rarely balance or crouch, and never crawl or climb. Tr. 602. The report indicated that Plaintiff could sit or stand for less than two hours in an eight-hour workday. Tr. 602. Finally, Dr. Carroll determined that Plaintiff would be off-task 20% of the time in a work setting and would miss three days of work per month. Tr. 603.

In August of 2018, Plaintiff began seeing a new primary care physician, Dr. Mounir Shenouda. Tr. 889-90. Plaintiff reported chest pain. Tr. 891. Her exam indicated she was "healthy appearing" and "ambulating normally." Tr. 891. Dr. Shenouda ordered a chest x-ray, which revealed no acute cardiopulmonary findings, and referred Plaintiff to a cardiologist. Tr. 893, 667-68. Dr. Shenouda also ordered a thyroid ultrasound due to Plaintiff's reported fatigue. Tr. 914. The ultrasound found borderline thyroid size. Tr. 914. Plaintiff met with cardiologist, Dr. Norbert Urbanski, on September 6, 2018. Tr. 681. Dr. Urbanski ordered an echocardiogram. Tr. 683. Two months later, on November 13, 2018, Plaintiff's echocardiogram revealed no abnormalities and also showed "good exercise tolerance." Tr. 686.

Plaintiff presented to her rheumatologist's office on December 14, 2018, and reported experiencing hand numbness and weakness, elbow pain, and tenderness as a result of her fibromyalgia. Tr. 820, 822-23. Loreana Nelson, N.P., noted that Plaintiff reported that, due to

14

numbness in her fingers, she had begun dropping things, including gallons of milk and dishes.    Tr. 820.    NP Nelson's physical exam reflected tenderness in the left and right forearms and noted "positive" for fibromyalgia points.    Tr. 823.    Ms. Nelson referred Plaintiff for electromyography to measure the muscle response to electrical activity in Plaintiff's fingers.    Tr. at 824.    The results showed no abnormalities.    Tr. 808.

On February 20, 2019, Plaintiff presented to Dr. Shenouda to discuss the results of elbow x-rays that were ordered due to Plaintiff's elbow pain, and which reflected no abnormalities.    Tr. 883; 908-09.    Dr. Shenouda noted that Plaintiff was "healthy appearing" and "ambulating normally."    Tr. 884.    On March 21, 2019, Plaintiff saw her pulmonologist, Dr. Harris, and reported cough, fatigue, issues related to her sleep apnea and restless leg syndrome, as well as worsening depression.    Tr. 677.    Five days later, on March 26, 2019, Dr. Harris completed a medical source statement regarding Plaintiff's physical functional capacity.    Tr. 609.    He opined that Plaintiff was limited to sitting up to four hours per workday and to standing up to four hours per workday.    Tr. 611.    He also stated that Plaintiff could frequently lift items weighing less than ten pounds, but heavier items could rarely be lifted.    Tr. 610.    Finally, he noted that Plaintiff would have approximately three bad days per month.    Tr. 611.

On April 19, 2019, Plaintiff reported to Dr. Carroll that her fibromyalgia felt "about the same," and that the aches in her elbows were so intense at times that she had difficulty steering her car.    Tr. 814.    Her physical examination showed global tenderness throughout, but no tenderness during very firm stethoscope pressure, which the examiner noted was "somewhat inconsistent."    Tr. 818.    Three days later, on April 22, 2019, Dr. Shenouda opined that Plaintiff's prescribed medication may make her dizzy, drowsy, and unfocused.    Tr. 620-22.    He also stated that

15

Plaintiff's impairments would lead her to have two bad days per month during which Plaintiff could not work.   Tr. 622, 624.   In May 2019, Dr. Shenouda noted that Plaintiff appeared healthy, was ambulating normally, and exhibited normal muscle tone and strength, normal movement and station, and intact sensation.   Tr. 880.

Plaintiff returned to Dr. Carroll on October 18, 2019.   Tr. 1073.   She again reported that she felt "about the same," and was tolerating Cymbalta and Gabapentin fairly well.   Tr. 1073. Dr. Carroll's progress notes reflect that Plaintiff's sleep was still impaired, and upon physical examination, Plaintiff was globally tender.   Tr. 1076.   Dr. Carroll also noted that Plaintiff was globally tender, "even to really light touch at fibro tender points and non fibro points."   Tr. 1076. She further noted that Plaintiff is "not really exercising."   Tr. 1073.

Plaintiff saw Dr. Shenouda on November 20, 2019.   Her physical exam was normal.   Tr. 1580.   Dr. Shenouda refilled her medications and referred her to a psychologist for her anxiety and depression.   Tr. 1580-81.   Plaintiff followed up with Dr. Shenouda again on February 3, 2020.   Tr. 1624.   She reported lower quadrant abdominal pain, and Dr. Shenouda referred her for an abdominal CT and lab work.   Tr. 1627.   Then, on August 6, 2020, Plaintiff had a "telemedicine" visit with Dr. Carroll in follow-up for her fibromyalgia.   Tr. 1657.   Plaintiff indicated she felt "about the same" since her last visit.   Tr. 1657.   Dr. Carroll noted Plaintiff's fibromyalgia was "stable," that she would continue the "current regimen," and also discussed "sleep and exercise" with her.   Tr. 1661.

On March 23, 2021, Plaintiff returned to Dr. Harris and reported using her CPAP more frequently.   Tr. 1587.   On May 13, 2021, Plaintiff had another telemedicine visit with Dr. Carroll for follow-up on her fibromyalgia.   Dr. Carroll noted that Plaintiff was doing "okay overall," and

later in her notes "fairly well overall," and was trying to do a walking program, but that humidity made her symptoms worse. Tr. 1652-56. Dr. Carroll again discussed sleep and exercise with Plaintiff. Tr. 1656. Plaintiff returned to her rheumatologist, Dr. Carroll, on December 7, 2022, and reported increased achiness for the prior two weeks. Tr. 1897. Dr. Carroll observed that Plaintiff exhibited positive fibromyalgia tender points on examination. Tr. 1900. She diagnosed Plaintiff with fibromyalgia and noted Plaintiff was "more symptomatic of late." Tr. 1902. She advised continued exercise, sleep, stretching, and scheduled Tylenol. Tr. 1902.

<u>**Analysis**</u>

Plaintiff makes a two-fold challenge to the ALJ's decision that stems from what Plaintiff describes as the ALJ's failure to properly consider the "entirely subjective" nature of fibromyalgia symptoms. (Doc. 13, pp. 12-13). First, she argues that the ALJ erred in discrediting Dr. Carroll's medical opinion on the grounds that it heavily relied on Plaintiff's subjective symptoms and was unsupported by objective evidence. Second, she argues that the ALJ erred in finding that Plaintiff's subjective reports were inconsistent with the evidence, including her daily activities, and were not supported by the objective findings and the medical recommendations to exercise. The Court will address each argument in order.

**1. The ALJ's assessment of Dr. Carroll's medical opinion.**

Plaintiff first challenges the ALJ's assessment of Dr. Carroll's medical opinion as unpersuasive. An ALJ must consider the following factors when evaluating the medical opinion from a medical source: supportability; consistency; relationship with the claimant, including the length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and examining relations; specialization; and any

other factors that tend to support the medical opinion, including evidence that the medical source is familiar with other medical evidence or has an understanding of social security policies.   20 C.F.R. §§ 404.1520c(c), 416.920c(c).   The most important factors are the supportability and consistency of the opinion.   20 C.F.R. §§ 404.1520c(a), 416.920c(a).   Although the ALJ must consider all of these factors, he does not need to discuss each factor in his own opinion; the ALJ only needs to discuss the supportability and consistency factors.   20 C.F.R. §§ 404.1520c(b), 416.920c(b).   "Supportability measures how much the objective medical evidence and supporting explanations presented by a medical source support the opinion," while "consistency assesses how a medical opinion squares with other evidence in the record."   *Michelle D. v. Kijakazi*, No. 21 C 1561, 2022 WL 972280, at *4 (N.D. Ill. Mar. 31, 2022) (citing 20 C.F.R. §§ 404.1520c(b)(1), (2)). A minimal articulation of the ALJ's reasoning for assessing a medical opinion will suffice so long as the ALJ considers the regulatory factors and "builds a logical bridge from the evidence to his conclusion."   *See Angie S. v. Kijakazi*, 21 C 5978, 2022 WL 17093363, at *6 (N.D. Ill. Nov. 21, 2022) (citation and internal quotation marks omitted).

The ALJ found Dr. Carroll's opinion unpersuasive on three grounds.   Tr. 1113.   First, the ALJ noted that the opinion was not supported by the "mostly mild examination findings."   *Id.* Second, he found that Dr. Carroll's opinion was provided on a check-mark-only form, was not supported by a narrative explanation, and there was no citation to objective evidence or laboratory findings that would support the opined limitations.   *Id.*   Third, the ALJ concluded that Dr. Carroll's opinion was unpersuasive because it relied heavily upon Plaintiff's own subjective reports of symptoms and limitations.   *Id.*   Plaintiff challenges all those grounds.   Doc. 13, p. 13-16.   For the reasons set forth below, the Court finds that the ALJ did not err in rejecting Dr.

18

Carroll's opined limitations.

First, contrary to Plaintiff's assertion, the ALJ properly considered Plaintiff's "mostly mild examination findings" in assessing Dr. Carroll's medical opinion.   Plaintiff cites *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996), as well as decisions from appellate courts outside this Circuit, for the proposition that fibromyalgia "symptoms are entirely subjective," and that normal musculoskeletal exam findings are irrelevant in assessing the severity of its symptoms.   Doc. 13, pp. 14-15.   However, the Seventh Circuit has more recently explained that an ALJ may properly rely on the musculoskeletal exam findings to assess the severity of fibromyalgia symptoms.   *See also Gebauer v. Saul*, 801 F. App'x 404, 410 (7th Cir. 2020) (unpublished).   Facing the same challenge in *Gebauer*, the court found that the ALJ properly declined to afford controlling weight to a treating physician's more limiting opinion where the physician's treatment notes characterized the claimant as "'alert,' recorded her discomfort as 'mild,' and did not record any difficulty walking, standing, or sitting nor note any symptoms (muscle atrophy, limited range in motion, or sensory loss) typically associated with disabling pain."   *Id.* at 406-08.

Likewise, here the ALJ found that Dr. Carroll's opined limitations regarding Plaintiff's inability to walk, sit, and stand for more than two hours each were inconsistent with the "mostly mild examination findings."   Tr. 1113.   While the ALJ did not analyze those findings in the section discussing Dr. Carroll's opinion, there was a detailed presentation of them in his immediately preceding discussion of the medical evidence.   Tr. 1107 (citing Tr. 464-66, 510, 513, 517-18, 521); 1108 (citing Tr. 686, 888, 884, 891).   "An ALJ need not rehash every detail each time he states conclusions on various subjects."   *Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021).   Reading the ALJ's decision as a whole, his conclusion that Dr. Carroll's extreme

19

limitations were inconsistent with the "mostly mild objective exam findings throughout the record" is supported by substantial evidence. *See Deloney v. Saul*, 840 F. App'x 1, 5 (7th Cir. 2020) (ALJ's analysis of a medical opinion can find support "elsewhere in his decision"); *Zellweger v. Saul*, 984 F.3d 1251, 1252 (7th Cir. 2021) (noting that courts may read "an ALJ's decision holistically").

Next, Plaintiff argues Dr. Carroll's opinion was adequately supported by objective medical findings in that it cited Plaintiff's positive tender point assessment, which she alleges is the only "definitive objective evidence of fibromyalgia." Doc. 13, p. 15 (citing Tr. 601). However, Plaintiff misreads the ALJ's decision. The ALJ did not find Dr. Carroll's opinion unsupported as to the diagnosis of Plaintiff's fibromyalgia. Rather, he found it unsupported as to the more extreme opined limitations attributed to Plaintiff's pain, including that Plaintiff "could sit, stand, and walk less than 2 hours each," and that she "would miss 3 days of work per month." Tr. 1113 (citing 601-03). Plaintiff does not point to any musculoskeletal or other objective medical evidence, such as "reduced joint motion, muscle spasm, sensory deficit or motor disruption," that supports Dr. Carroll's opined limitations. *See* SSR 16-3p; 20 C.F.R. § 404.1529(c)(2).

Likewise, the Court does not find an error with the ALJ's discounting of Dr. Carroll's opinion because it heavily relied on Plaintiff's subjective complaints. The Seventh Circuit has repeatedly held that "an ALJ may discount a medical opinion that is based primarily upon a patient's subjective complaints." *Casten v. O'Malley*, No. 24-1583, 2024 WL 4891188, at *3 (7th Cir. Nov. 26, 2024) (citing *Prill v. Kijakazi*, 23 F.4th 738, 751 (7th Cir. 2022)). Plaintiff counters that a medical opinion can be rejected only if it *solely* relies on the claimant's subjective symptoms. Here, she argues, Dr. Carroll did not "solely" rely on Plaintiff's subjective reports for reaching her

decision because she also pointed to the positive tender points test.   However, as discussed above,
the ALJ took issue not with the lack of objective evidence for the fibromyalgia diagnosis but rather
with the opined limitations due to pain.   Plaintiff does not explain how the positive tender point
test provides objective evidence as to her ability to stand, sit, or walk for less than two hours each.
*See Pufahl v. O'Malley*, No. 23-C-612, 2024 WL 770694, at *23 (E.D. Wis. Feb. 9, 2024) ("Tender
points may be used to establish the presence of fibromyalgia; once that is done, however, the ALJ
may consider the objective medical and other evidence of record to determine the severity of the
impairment.") (citing SSR 12-2p; *Gebauer*, 801 F. App'x at 410).   The ALJ not only noted the
absence of objective medical findings supporting Dr. Carroll's opined limitations, but also
specifically pointed to Dr. Carroll's statement in her opinion that Plaintiff "feels like pain
throughout her body" to illustrate Dr. Carroll's reliance on Plaintiff's subjective complaints.   Tr.
1113 (citing Tr. 601).   Substantial evidence, including Dr. Carroll's treatment record showing no
"gait abnormalities, motor-strength deficits, or range-of-motion deficits," supports the ALJ's
determination to discount Dr. Carroll's more severe opined limitation.   *Casten,* 24-1583, 2024
WL 4891188, at *4; *see also Rice v. Barnhart*, 384 F.3d 363, 370–71 (7th Cir. 2004) (upholding
the ALJ's rejection of a medical opinion noting that where "clinical findings were negative, . . .
the limitations on lifting, sitting, and walking were presumably based upon [the claimant's]
subjective complaints).

Even more, the ALJ explained that Dr. Carroll's opined limitations were unpersuasive
because they were offered in a check-mark-only form and were not supported by a narrative
explanation.   Tr. 1333.   *Karen L. S. v. Comm'r of Soc. Sec.*, No. 19-cv-1187, 2020 WL 4673146,
at *6 (S.D. Ill. Aug. 12, 2020) ("It is not error to reject a treating physician's opinion that consisted

of checkmarks on a form in which there were minimal to no open-ended questions and in which it was reliant on the plaintiff's subjective complaints.") (citing *Apke v. Saul*, 817 F. App'x 252 (7th Cir. 2020)).   Accordingly, the Court finds that the ALJ's decision to reject Dr. Carroll's more extreme opined limitations was supported by substantial evidence.

### 2.  Severity of Plaintiff's Subjective Limitations

Plaintiff next targets the ALJ's assessment of Plaintiff's subjective limitations as unpersuasive.   An ALJ's assessment of a claimant's reports regarding the "intensity, persistence, and limiting effects of" her subjective symptoms will not be disturbed unless it is "patently wrong," meaning that it "lacks any explanation or support."   *Weber v. Kijakazi*, No. 20-2990, 2021 WL 3671235, at *5 (7th Cir. Aug. 19, 2021) (citation and internal quotation marks omitted).   At the same time, when that assessment rests on "objective factors or fundamental implausibilities rather than subjective considerations," such as the demeanor of the claimant, the court has "greater freedom to review" that assessment.   *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (citation and internal quotation marks omitted).   An ALJ must "adequately explain" whether the claimant's report of subjective symptoms is persuasive or not and discuss "specific reasons supported by the record."   *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016) (superseding SSR 96-7p).   Although an ALJ does not need "to address every piece of evidence," some legitimate reason must be articulated to establish an "accurate and logical bridge from the evidence to [the] conclusion."   *Clifford*, 227 F.3d at 872 (citation omitted).

The Social Security Administration has issued guidance addressing the evaluation of disability claims that are based on fibromyalgia.   SSR 12-2p, 2012 WL 3104869, at *1 (July 25, 2012).   As explained therein, "[f]ibromyalgia is a complex medical condition characterized

primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." *Id.* The guidance explains that an ALJ should find that fibromyalgia is a medically determinable impairment if there is a diagnosis by a physician based on objective medical evidence that includes, among others, a history of widespread pain accompanied by a positive tender-point sites test on physical examination. *Id.* at *2-3.

Once the ALJ has established that the claimant has a medically determinable impairment of fibromyalgia, the next step is to evaluate whether the diagnosis impairs the claimant's "functional abilities" to an extent that precludes performance of any "substantial gainful activity." *Id.* at *2. The guidance directs the ALJ to follow the agency's relevant regulations for assessing the claimant's subjective symptoms. SSR 12-2p (citing 96-7p; 20 CFR 404.1529(b) and (c) and 416.929(b)). In turn, SSR 16- 3p, which superseded SSR 96-7p, directs the ALJs that objective medical evidence, including "evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption," is "a useful indicator" of the severity of the claimant's subjective symptoms. SSR 16-3p; 20 C.F.R. § 404.1529(c)(2); *see also Gebauer*, 801 F. App'x at 410 (noting that an ALJ assessing pain-related symptoms and limitations attributable to fibromyalgia can properly consider evidence of "reduced joint motion, muscle spasm, sensory deficit or motor disruption" in accordance with 20 CFR 404.1529(b)). When, however, the objective medical evidence does not corroborate the claimant's reports regarding "the intensity, persistence, and functionally limiting effects of symptoms," the ALJ must "consider all of the evidence . . . including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." SSR 12-2p; *see also Apke v. Saul*, 817

23

F. App'x 252, 257 (7th Cir. 2020) (recognizing that "often there is no objective medical evidence indicating the presence or severity of fibromyalgia," and instructing the ALJ to look to the claimant's reported activity levels and treatment received to determine the severity of the claimant's fibromyalgia symptoms).

*Objective Medical Evidence*

Here, following SSR 12-2p and 16-3p, the ALJ began his assessment by examining the medical record to confirm whether it substantiates Plaintiff's statements about the severity of her fibromyalgia symptoms.   Tr. 1107.   The ALJ engaged in a detailed, four-and-a-half-page analysis of Plaintiff's medical record with specific citation to Plaintiff's longitudinal medical record, spanning from the year 2015, the onset of Plaintiff's alleged disability, through 2022.   Tr. 1107-11.   The ALJ noted that while the tender point tests throughout the relevant timeframe consistently exhibited tenderness, the medical record also documented primarily "mild to moderate" physical examination findings including normal gait, normal to mildly reduced range of motion, and no swelling, all inconsistent with Plaintiff's subjective complaints of "debilitating symptoms and limitations."   Tr. 1107-10 (citing Tr. 521, 518, 470, 477, 464-66, 513, 891, 888, 884, 880).   Within the long list of the cited medical records, the ALJ further pointed to a negative stress echocardiogram on November 13, 2018, that demonstrated Plaintiff's "good exercise tolerance" and "an adequate heart rate response to exercise," which the ALJ also found inconsistent with the level of movement limitations Plaintiff alleges.   Tr. 1109 (citing Tr. 686).   The ALJ further noted a tender-point examination with "somewhat inconsistent" findings because Plaintiff did not exhibit tenderness during very firm pressure, as well as another musculoskeletal exam where Plaintiff appeared "globally tender, even to very light touch at both fibromyalgia tender

24

points and non-fibromyalgia points." Tr. 1109 (citing 818); Tr. 1110 (citing 1076). The ALJ further concluded that the Plaintiff's alleged memory problems or forgetfulness, including her allegation that she has become incapable of managing the family finances, were inconsistent with numerous medical records documenting that her memory was intact and normal. Tr. 1101-11 (citing 521, 1580, 1575, 1572, 1623, 1607, 1786, 1701, 1690-96).

As Defendant correctly points out, Plaintiff does not allege that the ALJ overlooked or misconstrued any objective medical evidence. (Doc. 18, p. 12). Rather, she argues that the ALJ's reliance on normal physical exam findings, including Plaintiff's normal gait and normal to mildly reduced range of motion, demonstrates his "misunderstanding of fibromyalgia." (Doc. 13, p. 20). She claims that those objective findings are not inconsistent with Plaintiff's alleged fibromyalgia symptoms and the ALJ erred in relying on them. However, this argument is inconsistent with the plain language of the Social Security Act and the aforementioned regulations and guidance, which instruct the ALJs to consider such objective medical evidence. *See* 20 C.F.R. § 404.1529(c)(2) ("reduced joint motion, muscle spasm, sensory deficit or motor disruption" to be considered when assessing the severity of a claimant's fibromyalgia symptoms); SRR 16-3 (same).

Plaintiff cites two cases from this district court in support of the proposition that "the ability to exhibit normal gait, range of motion, and maintain strength is not inherently inconsistent with . . . claims of disabling pain related to her fibromyalgia and rheumatoid arthritis." Doc. 13, p. 20 (citing *Terri E. G. v. Commissioner of Social Security*, 2018 WL 4095745, at *12 (S.D.Ill., 2018); *Steiner v. Berryhill*, 2017 WL 3704357, at *8 (S.D.Ill., 2017)). However, the Seventh Circuit has more recently rejected similar arguments, noting that they are "rooted in misapprehension." *Gebauer*, 801 F. App'x at 410. As the Seventh Circuit explained, SSR 12-2p only limits "the

25

evidence used to *diagnose* the disease as a medically determinable impairment" under step two of the five-step analysis, but not "the evidence an ALJ can consider in evaluating the *severity* of fibromyalgia for purposes of determining a residual functioning capacity."   *Id.*   The court also pointed to the relevant agency regulation instructing the ALJ to look at "evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption" as being "a useful indicator" of the severity of the claimant's subjective symptoms.   *Id.* (quoting 20 C.F.R. § 404.1529(c)(1), (3)). While it is true that the lack of supporting objective medical evidence cannot be the sole basis for discrediting a claimant's reported fibromyalgia symptoms, it can still be properly considered as one of the factors weighing in the ALJ's overall assessment as to the severity of those symptoms. *See Kinnari A. v. Saul*, No. 19 C 760, 2020 WL 1863291, at *12-13 (N.D. Ill. Apr. 14, 2020) (quoting *Stark v. Astrue*, 2007 WL 5601488, at *14 (W.D. Wis. Mar. 28, 2007), *aff'd*, 278 F. App'x 661 (7th Cir. 2008) ("[E]ven in fibromyalgia cases, the administrative law judge is permitted to consider a discrepancy between the medical evidence and a plaintiff's subjective complaints as a factor tending to undermine the plaintiff's credibility. It just can't be the only factor.").

Here, the ALJ did not solely rely on the absence of objective medical records in assessing the severity of Plaintiff's fibromyalgia symptoms.   Rather, following SSR 12-2p's framework, the ALJ also looked to Plaintiff's daily activities and medical treatment to complete his assessment. Accordingly, the ALJ's reliance on those objective findings is not a ground for reversal as long as the evidence as a whole substantially supported his assessment of Plaintiff's subjective limitations. *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (while ALJ cannot ignore complaint of pain because it is not fully supported by medical evidence, "discrepancies between objective evidence and self-reports may suggest symptom exaggeration.").   Therefore, the Court will turn to the

26

examination of those additional grounds.

*Activities of Daily Living*

The ALJ reviewed Plaintiff's daily activities as reported on Plaintiff's two Function Reports and the record as a whole and concluded that their wide range was inconsistent with Plaintiff's allegations regarding the severity of her subjective symptoms.   Tr. 1111-12.   Plaintiff claims that this portion of the ALJ's decision is substantially a recitation of his first decision, which was remanded due to the ALJ's failure to consider the difficulty Plaintiff had in performing those activities.  *See Jakita M. v. Comm'r of Soc. Sec.*, No. 3:20-CV-01269-GCS, 2022 WL 2072930, at *7 (S.D. Ill. June 9, 2022) (finding that "the ALJ's reliance on daily activities was improper because he failed to consider the numerous limitations on such activities").   For the reasons set forth below, the Court agrees with Plaintiff.

The ALJ began his analysis by referring to an employment application Plaintiff filled out on February 1, 2016.   Tr. 1111.   There, Plaintiff reported that she volunteered at an elementary school by selling books at a book fair and assisting children with their book purchases, as well as at a religious community by sharing her knowledge of the Bible with others.   Tr. 1111 (citing Tr. 729).   The ALJ did not explain how these specific activities are inconsistent with Plaintiff's subjective limitations.   Specifically, it is unclear from the record when the Plaintiff engaged in these volunteer activities, the frequency of these engagements, and whether she did so during the time she was experiencing flare-ups.   The ALJ had the opportunity to ask Plaintiff regarding those volunteering activities at both hearings, but did not do so.   *See Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014), *as amended* (Aug. 20, 2014) (noting that the court could not "assess the validity of the ALJ's determination because the record [was] devoid of information that might

support her assessment and the ALJ did not ask follow-up questions that might prove insightful").
The limited information on the record does not support the ALJ's finding of an inconsistency
between Plaintiff's subjective complaints and her report of some volunteering activities in
February 2016.

Next, the ALJ looked at Plaintiff's March 2018 Function Report.  Tr. 1111 (citing 341-
349).  This part of the decision is a recitation of the ALJ's overturned initial decision denying
Plaintiff's benefits.  Compare Tr. 1111 with Tr. 29.  The only part missing in the ALJ's new
decision is the boilerplate language that "the physical and mental capabilities required in
performing many of the household tasks and social interactions [Plaintiff] described essentially
replicate those necessary for obtaining and maintaining employment."  *Id.*  However, the
removal of this boilerplate language does not negate the fact that the ALJ again disregarded
Plaintiff's reported limitations while engaging in those daily activities.  For example, as Judge
Sison noted,

> Plaintiff, reported that she spends most of the day in bed.  Plaintiff did report being
> able to dress herself, bathe, care for her hair, and shave; she could also perform the
> household chores of folding towels, watering plants, and doing basic cleaning.
> However, Plaintiff clarified that she needed "a lot of breaks" and help from her
> family to complete the chores.  Between naps, Plaintiff would read and watch tv.
> Further, the record reveals that Plaintiff did not shop alone because of falls,
> confusion, and fatigue.  She also did not pay bills because she forgot to pay them
> in a timely manner and received late fees.  The ALJ's discussion did not examine
> the portions of the record which demonstrated that Plaintiff took many breaks,
> napped multiple times a day, and needed assistance during the day due to her
> symptoms.

*Jakita M.*, No. 3:20-CV-01269-GCS, 2022 WL 2072930, at *7.(internal citation omitted).

In his new decision, the ALJ again failed to discuss those limitations despite being
instructed to do so by the court.  Notably, earlier in his decision, the ALJ also noted that he finds

the March 2018 Function Report unpersuasive because Plaintiff stated that she could walk 10-15 minutes but needed to rest for 20-30 minutes, yet she reported shopping for groceries for an hour. Tr. 1106 (citing 344, 346).    However, a closer review of the form shows no inconsistency: Plaintiff explicitly stated therein that shopping "can take up to an hour or longer" because she has "to take breaks to rest."    Tr. 344.

The ALJ committed the same error in concluding that Plaintiff's "wide variety of activities" as reported in her Function Report of May 2021, was inconsistent with her report of subjective symptoms.    The ALJ noted that Plaintiff "scheduled doctor appointments for her family and sorted her husband's clothes from the laundry, drove her son to work twice a week, and shopped for things for the home and her family's needs."    Tr. 1112 (citing 1469-77).    However, he did not consider Plaintiff's statement in the same form that she only folds clothes once or twice a month, that someone needs to bring the laundry to her, and that this task only takes about 10-15 minutes. Tr. 1471.    The ALJ further did not consider that while Plaintiff drives her son to work twice a week, her husband, uncle, and other friends help with picking him up from work.    Tr. 1470.    The ALJ also found this statement inconsistent with Plaintiff's report that she does not go anywhere on a regular basis.    Tr. 1112 (citing 1473).    However, this report pertained to the "places [Plaintiff] goes on a regular basis" for social activities, such as "*church, community center, sports events, social groups, etc.*"    Tr. 1473.    Plaintiff responded that she goes "[n]o where outside home," but she attends some religious services via Zoom.    *Id.*    Driving her son to work twice a week, however, would likely not be considered a social activity.    Likewise, the ALJ noted that Plaintiff goes out to stores once or twice per month.    Tr. 1112.    Again, this was in response to her ability to do shopping, and Plaintiff clarified that she goes out to stores, with her husband or

children, only for 20 minutes at a time.   Tr. 1472.   In any case, spending 20 minutes at stores twice per month is not the type of activity that comes to mind when listing places one goes on a regular basis for social interaction.   Accordingly, Plaintiff's statements that she drives her son to work twice per week or that she goes out to stores twice per month are not inconsistent with her statement that she does not go anywhere on a regular basis for social activities, as the ALJ concluded.

The ALJ also found Plaintiff's reported symptoms to be inconsistent with her reports of working in the yard.   Tr. 1122.   A closer examination of the record, however, does not support that finding either.   Plaintiff reported on both Function Reports that she does not do any yard work.   Tr. 343-44; 1472.   Plaintiff's medical record does include a single note that Plaintiff reported: "intermittent increases in pain in July 2021 due to weather and working around her house and yard."   Tr. 1110 (citing Tr. 1941).   However, it is unclear what type of yard work Plaintiff conducted on that single occasion, and there is also nothing in the record to indicate that Plaintiff engaged in such activity regularly.   Again, the ALJ had the opportunity to ask Plaintiff for details about that single occurrence of unidentified yard work twice, but did not do so.   Notably, the cited medical record could possibly corroborate Plaintiff's report that she cannot do yard work: following that single report of unidentified yard work, Plaintiff's pain increased to such a degree that she had to seek medical attention.   Tr. 1920.

The ALJ also noted that in August 2021, Plaintiff reported increased pain after a football game and barbecue event over the weekend and inferred that Plaintiff's participation in such activity was inconsistent with her subjective reports.   Tr. 1110 (citing Tr. 1939); Tr.1112.   Yet, this is again an isolated event over the span of six years, and it is unclear from the record what

exactly Plaintiff did during that football game and barbecue event. Tr. 1939. What is clear, however, is that following that event, Plaintiff sought medical attention to address her increased pain in her lower back. Tr. 1939. The ALJ further inferred that Plaintiff's participation in the football game and barbecue is inconsistent with her claim that she does not go anywhere. Tr. 1110 (citing Tr. 1473). However, the ALJ again omitted an important detail: referring to social activities, Plaintiff stated that she goes "nowhere outside home" *on a regular basis*. Tr. 1473. The ALJ's citation to a single occurrence of Plaintiff being at a football game falls short of showing Plaintiff's engagement in such activity on a regular basis.

At most, the record shows a few sporadic and isolated instances of Plaintiff's engagement in social activities in the span of six years that do not support the ALJ's finding of a "wide range of activities of daily living" that are inconsistent with Plaintiff's reports of subjective symptoms. This is especially true in light of the waxing and waning nature of fibromyalgia's symptoms and Plaintiff's reports that she experienced increased pain following those sporadic activities. Further, the Court concludes that the ALJ's finding of inconsistency between the Plaintiff's daily activities as reported in her Function Reports and her report of subjective symptoms was improper in that it failed, for a second time, to consider the Plaintiff's numerous limitations in engaging in those activities. *See, e.g.*, *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (noting that "an ALJ cannot disregard a claimant's limitations in performing household activities") (citations omitted); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (stating that "[t]he ALJ ignored [the plaintiff's] qualifications as to how he carried out those activities ... Each activity left him exhausted.") (emphasis in original). Overall, the ALJ's analysis of Plaintiff's daily activities does not substantially support his assessment of Plaintiff's subjective limitations. However, the analysis

does not end there, because the Court also needs to consider whether the remaining factors that the ALJ considered substantially support his discrediting of Plaintiff's subjective complaints.

*Recommendations for Exercise*

The ALJ also found that Plaintiff's reports regarding the severity of her subjective symptoms were inconsistent with the "repeated medical recommendation to exercise." Tr. 1110. The ALJ cited two treatment records, which include only general recommendations for exercise and physical therapy. Tr. 1107 (citing Tr. 511; 519); 1110 (citing 1077). The Seventh Circuit has instructed that "general recommendations of physical activity do not contradict [a claimant's] alleged limits from fibromyalgia." *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018). When a medical provider does "not elaborate on the type, duration, or intensity of the physical activity they would recommend, these medical sources may have had in mind activity that was within [Plaintiff's] alleged limits—for instance, walking a few times a week for a few minutes each time." *Id.* Here, as in *Gerstner,* the cited records do not include details about the type of recommended exercise to determine whether this would be inconsistent with Plaintiff's alleged limitations. *See, e.g.*, Tr. 1077 ("discussed diet and exercise"); Tr. 511 ("had a long discussion . . . about the importance of exercise and sleep); Tr. 519 ("Suggested PT but [Plaintiff] wants to wait for now"). Notably, the ALJ acknowledged that Plaintiff failed to follow through with those recommendations for physical exercise, which could corroborate Plaintiff's reported physical limitations. *See* Tr. 1106 (citing Tr. 511, "does not really exercise at all"); 1110 (citing Tr. 1073, "not really exercising"); *see also Gerstner*, 879 F.3d at 264 ("More importantly, the record reflects that at the time of the hearing, Gerstner was totally inactive, undermining any suggestion that she could exercise beyond her alleged limits."). Accordingly, the ALJ's conclusion that the severity

of Plaintiff's reported limitations was inconsistent with the "repeated medical recommendation to exercise" is not supported by the record.

Defendant also argues that Plaintiff's failure to follow through with the recommendations for exercise indicates that she exaggerated her subjective limitations. However, the ALJ did not provide Plaintiff's *failure* to follow through with her recommended exercise as a basis for discrediting her subjective complaints. Rather, he references the *recommendation* for exercise as being inconsistent with Plaintiff's subjective complaints and limitations. Tr. 1110 ("The repeated medical recommendation to exercise is inconsistent with the level of limitation the claimant alleges."). In any case, the Court is not convinced that any discussion of Plaintiff's failure to follow through with the recommendation for exercise provides substantial support for the ALJ's overall assessment of her subjective symptoms. "The ALJ may deem an individual's statements less credible if medical reports or records show that the individual is not following the treatment as prescribed." *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014), *as amended* (Aug. 20, 2014) (citing SSR 96–7p; *Craft v. Astrue,* 539 F.3d 668, 679 (7th Cir. 2008)). Nonetheless, "such evidence should not negatively affect an individual's credibility if there are good reasons for the failure to complete the plan." *Id.* (citing *Craft,* 539 F.3d at 679). The Seventh Circuit has instructed that ALJs "may need to question the individual at the administrative proceeding to determine whether there are good reasons the individual did not seek medical treatment or fully comply with prescribed treatment." *Id.* (citing SSR 96–7p; *Shauger v. Astrue,* 675 F.3d 690, 696 (7th Cir.2012)).

Here, the ALJ did not ask Plaintiff the reasons for her failure to follow through with the recommendation for exercise. At the first hearing, however, Plaintiff testified that she tries to do

the recommended exercises daily, but some days she is unable to do them due to pain.  Tr. 61.

Further, as discussed above, Plaintiff's pain symptoms appeared to increase after engaging in a

more active lifestyle.  Plaintiff's medical record also shows that Plaintiff's hip pain showed no

improvement even after Plaintiff attended physical therapy sessions.  Tr. 468.  Because the ALJ

did not discuss whether and to what extent he considered Plaintiff's failure to consistently exercise

in assessing her subjective limitations, the Court is unable to determine whether such assessment

was supported by substantial evidence.  *See Murphy*, 759 F.3d at 816 (concluding that the ALJ

erred in finding the claimant's report of subjective symptoms not credible because she did not

complete physical therapy, where the ALJ did not question the claimant about the reasons for not

attending all sessions).

*Effectiveness of Treatment*

Defendant further argues that the ALJ's consideration of the record showing the

effectiveness of Plaintiff's treatment substantially supports his assessment of Plaintiff's subjective

limitations.  While it is true that the ALJ may properly consider the prescribed medication and

other treatment the claimant receives to alleviate her symptoms, here, it is not clear how the ALJ

assessed those factors.

The ALJ's discussion of the effectiveness of Plaintiff's treatment is essentially split into

two sections.   The first section consists of some references to medication and treatment Plaintiff

received from 2015 through 2019 as part of the ALJ's examination of Plaintiff's medical record.

Tr. 1107-10.   This section is substantially a recitation of the ALJ's initial decision and focuses on

the inconsistencies between Plaintiff's subjective complaints and the normal to mild objective

medical findings.   Nearly every paragraph of that section recites excerpts of Plaintiff's medical

34

record and concludes that the normal to mild objective exam findings do not support the claimant's subjective complaints.   Tr. 1107-11 ("in a number of exams, the claimant's complaints exceed the objective findings," "normal test findings do not support the claimant's subjective complaints," good functioning on exams and testing support her ability to work within the light residual functional capacity," etc.).   Even though Plaintiff's treatment and medication are sporadically referenced therein, the ALJ does not explain how he considered them in evaluating Plaintiff's subjective complaints.   *See* Tr. 1107 ("doctor recommended physical therapy, but the claimant declined" "fibromyalgia was fairly well controlled"); Tr. 1108 ("a known side effect of Gabapentin drowsiness"); 1110 ("Claimant said she was feeling about the same, was not exercising, was tolerating the Cymbalta and Gabapentin, and was working on sleep hygiene).   Notably, the ALJ references a medical note from January 26, 2018, when Plaintiff presented to a medical provider with flu-like symptoms.   Tr. 1108 (citing 764).   The ALJ points to a notation that Plaintiff was "feeling better."   Tr. 1108 (citing 764).   In fact, the relevant record states: "She is wanting to make f/u for her fibromyalgia when she is feeling better."   Tr. 764

The second area that discusses the effectiveness of Plaintiff's medication and treatment is in the section analyzing Plaintiff's more recent records, from December 2020 to May 2021.   Tr. 1110.   The ALJ began his analysis by noting that this more recent record shows Plaintiff "was doing well overall and she was continued on her current medication regiment [sic]" even though humidity could make her symptoms worse.   Tr. 1110 (citing Tr. 1656).   The ALJ also cites to a medical examination from October 1, 2021, when Plaintiff reported, among other findings, no arm pain on exertion, no shortness of breath when walking, no sleep apnea or disturbances, no muscle aches or weakness, no arthralgia or joint pain, no back pain, no swelling in the extremities, and no

35

fatigue.   Tr. 1110 (citing 1775).   The ALJ noted that this report was inconsistent with Plaintiff's statement that she was experiencing pain every day.   Tr. 1110 (citing 1512).   However, even within this six-month window, the ALJ still noted that Plaintiff experienced intermittent increases in pain due to weather and her engagement in a more active lifestyle (the single reference to a football game and barbeque event).   The ALJ's analysis in this paragraph provides some support for discrediting Plaintiff's subjective complaints regarding her debilitating pain during that six-month timeframe.   However, given that the fibromyalgia symptoms wax and wane and the overall time period involved, the Court cannot find that the ALJ's analysis of the effectiveness of Plaintiff's medication and treatment substantially supports his discrediting of Plaintiff's subjective limitations.

In sum, considering the ALJ's analysis of Plaintiff's subjective symptoms as a whole, the Court finds that it is not supported by substantial evidence.   While the ALJ did not err in considering the lack of objective medical evidence supporting Plaintiff's allegations, his analysis of the remaining factors is problematic.   Notably, the ALJ disregarded for a second time Plaintiff's reported limitations in performing her daily activities, and he found inconsistencies based on misstated portions of the record.   Because an ALJ cannot only rely on the lack of objective evidence to discredit Plaintiff's subjective limitations, and because the remaining reasons the ALJ set forth do not substantially support his assessment, the Court finds that remand is required.[4]   *See Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (internal citation omitted) ("If

---

[4]The Court notes that the ALJ also found the Plaintiff's allegations of memory problems and forgetfulness to be inconsistent with the record as a whole.   Tr. 1110-11.   Plaintiff does not appear to take issue with that assessment. In any case, the Court finds that the ALJ's assessment as to those limitations is substantially supported by the record showing that Plaintiff's memory was normal.   Tr. 1110-11 (citing 521, 1580, 1575, 1572, 1623, 1607, 1786, 1701, 1690-96).

a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required").

For the reasons set forth hereinabove, remand is required.  The Court stresses, however, that this Order should not be construed as an indication that the Court believes Plaintiff was disabled during the relevant period or that she should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and consideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: March 31, 2025**

*s/  Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**

37